FILED
2017 Jul-21  AM 09:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | |
|---|---|
| **DESIRE WHITFORD,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **CV-15-BE-1678-S** |
| **SUB-LINE ASSOCIATES, INC.** ] | |
| ] | |
| **Defendant**. ] | |
| ] | |
| ] | |

### MEMORANDUM OPINION

This matter is before the court on "Defendant's Renewed Motion for Judgment as a Matter of Law; or, in the Alternative, Motion for Remittitur; or, in the Alternative, Motion for a New Trial."  (Doc. 61). The Plaintiff filed a response.  (Doc. 64).  For the reasons stated in this Memorandum Opinion, the court WILL DENY all three motions.

### A.  RENEWED JMOL 50(b)—DOC. 61

The Defendant, Sub-Line Associates, Inc., brings this motion pursuant to Rule 50(b),[1] and renews its motion under Rule 50(a) made during the trial of this case.  The court had granted in part and denied in part Sub-Line's original motion for judgment as a matter of law, granting the motion as to the FLSA claim, and denying the motion as to all other claims.  This case was tried

---

[1] Although the docket sheet entitles this motion as a "Motion to Alter Judgment," which would fall under Rule 59, the actual title of the motion listed on the document is "Defendant's Renewed Motion for Judgment as a Matter of Law; or, in the Alternative, Motion for Remittitur; or, in the Alternative, Motion for a New Trial."

1

before a jury from February 27-March 2, 2017.  The court entered a final judgment (doc. 56) on March 6, 2017 in accordance with the following jury verdict: verdict in favor of the Plaintiff, Desire Whitford, and against Sub-Line on the claims of sexual harassment brought pursuant to Title VII; hostile work environment brought pursuant to Title VII; retaliation based on complaints of sexual harassment brought pursuant to Title VII; invasion of privacy; assault and battery; and negligent supervision, training, and/or retention.  However, the jury found for Sub-Line on the claim for wanton supervision, training and/or retention.  The jury awarded damages to Ms. Whitford as follows: $1,956 in lost wages, $30,000 for emotional pain and mental anguish, and $100,000 in punitive damages. (Doc. 55).  Sub-Line's renewed Rule 50(b) motion requests that this court set aside the verdict and judgment in favor of Ms. Whitford and enter a judgment in favor of Sub-Line as a matter of law on all of the Plaintiff's claims.  *See* Fed. R. Civ. P. 50 (a) & (b).

In its 50(b) motion, Sub-Line raises the following issues: (1) whether the evidence was sufficient to support Sub-Line's liability on the tangible job action sexual harassment claim, because it says Heather Brown made the decision to terminate her and not James Connison, the alleged harasser; (2) whether the evidence was sufficient to support Sub-Line's liability on the hostile work environment claim, because it says Sub-Line had no notice of the harassment and was not vicariously liable for it; (3) whether the evidence was sufficient to support Sub-Line's liability on the retaliation claim, because it says the Plaintiff failed to establish a causal link between her complaints of sexual harassment and the termination; (4) whether the evidence was sufficient to support Sub-Line's liability on the invasion of privacy claim for Mr. Connison's conduct; (5) whether the evidence was sufficient to support Sub-Line's liability on the assault

and battery claim for Mr. Connison's conduct; and (6) whether the evidence was sufficient to support Sub-Line's liability on the negligent hiring, training, or supervision claim.  The court will address these issues separately below.

"[I]n ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence."  *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007).  To determine the sufficiency of the evidence, a court considers "all the evidence, drawing all reasonable inferences in favor of the nonmoving party."  *Hubbard v. BankAtlantic Bancorp., Inc.,* 688 F.3d 713, 724 (11th Cir. 2012).  However, the court does "not make credibility determinations or weigh the evidence."  *Id.*  Rather, the court "give(s) credence to evidence supporting the nonmoving party's case, as well as 'uncontradicted and unimpeached' evidence supporting the moving party, 'at least to the extent that the evidence comes from disinterested witnesses.'"  *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000) (internal quotation marks omitted)).

A. Tangible Job Action Sexual Harassment

To succeed in proving discrimination based on sexual harassment resulting in a tangible employment action, Ms. Whitford must have proven by a preponderance of the evidence that Mr. Connison made unwelcome sexual advances toward her; that Mr. Connison took an adverse tangible employment action against her or caused Sub-Line to do so; that Ms. Whitford 's rejection of the unwelcome sexual advances was a motivating factor that prompted Mr. Connison to take the adverse tangible employment action or to cause Sub-Line to do so; and that Ms. Whitford suffered damages because of the adverse tangible employment action.  *See* Pattern Civ.

Jury Instr. 11th Cir. 4.8 (2013); 42 U.S.C. § 2000e-2(a); *see also Hulsey v. Pride Rests., LLC,* 367 F.3d 1238, 1245 (11th Cir. 2004).

Sub-Line's challenge to the sufficiency of the evidence regarding her termination based on sexual harassment focuses upon the argument that because Heather Brown—not James Connison— made the decision to terminate her, no causal link exists between Mr. Connison's sexual harassment and the termination by Ms. Brown.  A plaintiff must establish a causal link between, on one hand, the tangible employment action and, on the other, the discriminatory animus towards the plaintiff based on the sexual harassment and/or the plaintiff's reaction to the harassment.  *See Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1245-46 (11th Cir. 1998).

The court notes preliminarily that, although Sub-Line focuses solely on the decision to terminate Ms. Whitford as the adverse employment action, she established another adverse employment action—Mr. Connison took her off the work schedule.  Ms. Whitford testified that, after Mr. Connison's sexual harassment of her in the cooler on October 12, 2014, when she rebuffed his unwelcomed advances, he took her off the store's work schedule that he controlled. Although she testified that she was willing to work and continued to ask him and Ms. Brown when she would be placed back on the work schedule, she never worked another day at the Subway store after cooler incident until she was terminated on October 16, 2014.  Mr. Connison disputed that he was responsible for taking her off the work schedule, but this disputed evidence was a question of fact for the jury.   Ms. Whitford's testimony is legally sufficient to support the jury's finding that Mr. Connison took an adverse tangible employment action against her or caused Sub-Line to do so; that Ms. Whitford 's rejection of the unwelcome sexual advances was a

motivating factor that prompted Mr. Connison to take the adverse tangible employment action or

to cause Sub-Line to do so; and that Ms. Whitford suffered resulting damage.

As to termination, Mr. Connison testified at trial that, at the time Ms. Whitford was

employed at Subway, he was the manager-in-training for the store where she worked, and he was

her boss.  Although Mr. Connison gave varying responses when asked whether he was at the

meeting when Ms. Whitford learned she was terminated, Mr. Connison consistently and

repeatedly testified at trial and in his deposition that he was involved in the decision to terminate

Ms. Whitford's employment:

> Q.  Were you involved in the termination meeting of Ms. – where Ms. Whitford
> was fired?
> A. [Ms. Whitford]: No.
> Q.  Was it a joint decision amongst you, Ms. Brown, and Ms. Cannon to
> terminate her?
> A.  It was up to them, yes.
> Q.  Was it —were you involved in the decision?
> A.  Yes.
> Q.  Okay.  So you were involved in the decision to terminate her?
> A.  Yes.
> Q.  You were involved in the termination meeting of Ms. Whitford?
> A.  No.
>> THE COURT: What do you mean by termination meeting?  I want to
>> know what you understand that mean.
>> THE WITNESS: What I understand is Ms. Cannon and Ms. Brown
>> would have to pull Desire face to face to terminate her.
>> THE COURT: So when you say you weren't involved in the termination
>> meeting, you're referring to the meeting with Ms. Whitford?
>> THE WITNESS: Yes.
>> THE COURT: Thank you.
> Q.  Okay.   Line, Page 16, Line 21 of your deposition.
> * * * The question, were you in the – were you there involved in the termination
> meeting and you said what?
> A.  Of Desire?
> Q.  And my question is, right.  What's your answer?
> A.  Yes.
> Q.  So it was a joint decision amongst the three of y'all to terminate her.  What's

your answer?
A.  Yes.

    As to the authority he had as manager-in-training, Mr. Connison also testified at trial that

he had authority to discipline and "write up" the employees working at his Subway store.  And,

although he testified that he did not have authority to fire them without going through Heather

Cannon and/or Heather Brown, he acknowledged that he did have a "say so" in the firing.  He

testified in his deposition that Ms. Cannon and Ms. Brown "would generally follow [his] advice"

about whether to fire employees at his store, and he acknowledged that deposition testimony at

trial.

    Ms. Whitford testified that James Connison was responsible for taking her off the work

schedule from the time she rebuffed his sexual advances on October 12, 2014 until she was fired

on October 16, 2014.   She also testified that he participated in the decision to fire her, being

present at the termination meeting with Heather Brown on October 16, 2014; when Heather

Brown suggested that Ms. Whitford change stores because she had a problem with Mr. Connison,

he stated instead that Ms. Whitford was terminated.

>       A       [Ms. Whitford]: I told [Ms. Brown] I had to talk to her and I did not feel
>               comfortable saying it in front of James because he made everything into
>               a joke.  And I didn't feel like this was anything that should have been
>               joked about.  I wasn't going to laugh it off anymore.  I had had enough.
>               And so she sent him inside.  I told her everything that had been going
>               on and so on and so forth and she suggested possibly going to the Boaz
>               or to Guntersville store.  Well, then she said, well, I have to . . .let
>               James come out here and tell him what you said. . . .
>               ***
>       A       Her responses [sic] was, well, since you have a
>               problem with James anyway, it would probably be better
>               for you to go to another store.
>       Q       And -
>       A       So James said those are grounds for termination

> and that was it.
>
> Q   And what was the status of your employment at that
>     time?
>
> A   At that time I was still working, but -- when
>     James said I was terminated, I was terminated.
>
> Q   During this conversation, how soon after you had
>     spoken with Heather Brown about the sexual harassment
>     again did this termination conversation happen?
>
> A   The next day.
>
> Q   In terms of being out there on the 16th and the
>     conversation we were just talking about out in the alley
>     and James had gone inside and come back out, how soon
>     after that did this conversation where you were fired
>     happen?
>
> A   Immediately.

This evidence is legally sufficient to support the jury's finding that Mr. Connison took an adverse tangible employment action against her or caused Sub-Line to do so; that Ms. Whitford 's rejection of the unwelcome sexual advances was a motivating factor that prompted Mr. Connison to take the adverse tangible employment action or to cause Sub-Line to do so.

Ms. Brown and Mr. Connison said the reason for her termination was that Ms. Whitford allowed a non-employee into the store after hours against the rules. However, evidence such as the following was legally sufficient to support the jury's finding that the true reason for her firing was Mr. Connison's sexual harassment of her and her complaints about his conduct: evidence about the timing of her firing immediately after she complained to management of Mr. Connison's sexual harassing conduct; evidence that Kendra Dean, the person who trained Ms. Whitford, committed the same violation without being fired; and evidence that Sub-Line management knew of Ms. Whitford's violation of the rule two weeks before, gave her a verbal warning, but did not discipline her in writing until she further rebuffed Mr. Connison's advances.

Put another way, the court cannot and does not find that the jury lacked legally sufficient evidence for the requisite causal link on this claim; rather, it finds that the evidence sufficiently supports the jury's verdict for the Plaintiff on the claim for sexual harassment resulting in a tangible job action brought pursuant to Title VII.

For all of these reasons, the court's denial of Defendant's original motion for judgment as a matter of law on that claim was proper, and the court WILL DENY the Defendant's renewal of that motion as to the tangible job action sexual harassment claim.

B. Sexual Harassment - Hostile Work Environment

To succeed on her hostile work environment claim against Sub-Line, Ms. Whitford must have proven by a preponderance of the evidence that her supervisor harassed her because of her sex; that the harassment created a hostile work environment for her; and that she suffered damages as a result.   *See* Pattern Civ. Jury Instr. 11th Cir. 4.6 (2013); 42 U.S.C. § 2000e-2(a); *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc).

In its renewed motion for judgment as a matter of law on the hostile work environment claim, the Defendant Sub-Line argues that the evidence did not support a basis for holding Sub-Line liable for the bad acts of its employee(s); it argues that the court should not have submitted this claim to the jury for the following reasons: (1) Mr. Connison did not have the power to fire employees, so Sub-Line should not be held vicariously liable for his conduct; (2) Sub-Line had no notice of Mr. Connison's harassing conduct.

As discussed above, Ms. Whitford presented evidence that Mr. Connison disciplined and/or fired Ms. Whitford, or that he caused Sub-Line to do so.  Ms. Whitford also presented evidence that Ms. Brown and Ms. Cannon—both of whom were Sub-Line managers with

authority to discipline, hire and fire—had notice of Mr. Connisons's sexual advances toward her. Ms. Whitford testified that, during the second week of her employment, Ms. Brown met with Ms. Whitford and a couple of her other team members "and said she knows how James is and if anybody feels like he does or says anything out of the way to let her know and she'll handle it." After that meeting, Ms. Whitford pulled Ms. Brown aside and "told her about his sexual comments, him [sic] touching me, him – everything about the sub comments,[2] the sauce comments,[3] bending over comments, slapping me on my buttocks, grabbing me on my boobs, pulling me toward him, I told her everything . . . .and she said she would handle it."  Ms. Whitford testified that she knew of nothing Ms. Brown subsequently did to handle the situation, and that Mr. Connison's behavior did not change.

Ms. Whitford also testified that, on October 15, 2014, she reported Mr. Connison's sexual harassment of her in phone conversations with both managers, Ms. Brown and Ms. Cannon.  She told Ms. Cannon about Mr. Connison's "comments and actions and everything else, and she informed me that I need to take it up with Heather Brown."  Ms. Whitford had also told Ms. Cannon that she had previously complained to Heather Brown about Mr. Connison's sexual harassment.  Thirty minutes after speaking with Ms. Cannon, she spoke with Ms. Brown and advised her of Mr. Connison's harassment, resulting in the meeting at the Subway the next day, when Ms. Whitford was fired.

_____

[2] Mr. Connison's "sub comments" implied a relationship between the length of a 12-inch sub sandwich and his sexual organ: "I have more than twelve inches for you."

[3] Mr. Connison made what Ms. Whitford took to be a sexual reference, stating that "he heard his was spicy, and asked [Ms. Whitford] if [she] wanted to try it."

9

Accordingly, sufficient evidence existed that Sub-Line knew or should have known of the harassing conduct and failed to take prompt remedial action. Therefore, sufficient evidence existed for the jury to hold Sub-Line liable for the hostile work environment created by Mr. Connison against Ms. Whitford. The court's denial of Defendant's motion for judgment as a matter of law on that claim was proper, and the court WILL DENY the Defendant's renewal of that motion as to the hostile work environment claim.

C. Retaliation

To establish a case of retaliation based on complaints about sexual harassment, brought under Title VII, Ms. Whitford must have proven by a preponderance of the evidence that she reported sexual harassment; that Sub-Line subsequently took an adverse employment action against her because of the report of sexual harassment, ie., the adverse employment action would not have occurred but for her reporting the sexual harassment; and that she suffered damages as a result of the adverse employment action. 42 U.S.C. § 2000e *et. seq.*; *see University of Texas Sw. Med. Ctr. v. Nasser,* 133 S. Ct. 2517, 2533-34 (June 24, 2013).

In its renewed motion for judgment as a matter of law, Sub-Line asserts that Ms. Whitford failed to establish a "but-for" causal link between her termination and her complaint of sexual harassment. Specifically, Sub-Line first argues that the decision to fire Ms. Whitford occurred after she complained on October 16, 2014 and thus, the complaint could not have caused her termination. Secondly, it argues that Ms. Whitford's claim that her failure to capitulate to Mr. Connison's sexual advances caused her firing precludes her ability to recover for retaliation, which requires her complaints about the sexual advances to be the "but-for" cause of her termination.

The evidence does not support the first argument that her complaints of Mr. Connison's sexual harassment occurred *after* the termination decision. Rather, as set out earlier in this opinion, Ms. Whitford testified that she complained of such harassment to Ms. Cannon on October 15, 2014, and to Ms. Brown in September of 2014,weeks before her termination, and then again on October 15 and 16, 2014. Ms. Whitford also testified that the discussion with Heather Brown about being fired for the infraction of letting a non-employee into the store after hours made no sense because this infraction had been addressed and settled two weeks before without a formal write-up. This testimony provided legally sufficient evidence for a jury to determine that the true reason for her firing was her protected activity of complaining about sexual harassment.

Sub-Line's second argument focuses on the supposed inconsistency between, on one hand, Ms. Whitford's sexual harassment claim that the cause of her termination was her failure to capitulate to Mr. Connison's sexual advances and, on the other hand, her retaliation claim that the "but-for" cause of her termination was her protected conduct in *complaining* of sexual harassment, not her rebuffing of the harassment. This argument is inaccurate and mischaracterizes Ms. Whitford's testimony. One reason that it is inaccurate is that it assumes that the only possible adverse employment action was her termination. As noted earlier, Ms. Whitford's testimony stated that Mr. Connison responded to her rejection of his sexual advances by taking her off the work schedule, among other things. The evidence was legally sufficient for the jury to find that taking her off the work schedule depriving her of pay was an adverse employment action separate from her firing, and that Ms. Whitford's spurning of Mr. Connison's advances was a motivating factor for such action, resulting in damage to her. That finding would

11

not be inconsistent with the finding that her complaints of sexual harassment were the but-for cause of her termination.

Similarly, as to the hostile work environment claim, Ms. Whitford testified about Mr. Connison's repeated unwelcome, offensive acts and statements about sex.  This evidence was legally sufficient for the jury to find that, even apart from her termination, such offensive acts and statements were so severe or pervasive that they materially altered the terms and conditions of Ms. Whitford's employment, and that she so believed.  That finding would not be inconsistent with the finding that her complaints of sexual harassment were the but-for cause of her termination.

Because the court's denial of the original motion for judgment as a matter of law was proper and remains correct, and because legally sufficient evidence supports the jury verdict on this claim, the court WILL DENY the renewed motion for judgment as a matter of law as to the retaliation claim.

    D.  Sub-Line's liability under Alabama law for invasion of privacy

        1.  The tort of invasion of privacy

To successfully establish the tort of invasion of privacy under Alabama law against Sub-Line, Ms. Whitford must have provided legally sufficient evidence to reasonably satisfy the jury that the matters into which Mr. Connison intruded are of a private nature; that his intrusion was intentional and wrongful; that his intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame or humiliation; and that Sub-Line is liable for Mr. Connison's actions.  *See* APJI 35; *Busby v. Truswal Sys. Corp.,* 551 So. 2d 322, 323-24 (Ala. 1989).

Sub-Line argues that Ms. Whitford's "testimony of 'brushing her body,' tugging at her belt, and a few smatterings of 'sex talk' during the 10-17 hours Plaintiff and Defendant worked together do[es] not meet the high standard necessary for establishing the tort of invasion of privacy." (D's Renewed Motion. Doc. 61, at 13).  However, Sub-Line's summary of Ms. Whitford's testimony minimizes the extent of Mr. Connison's sexual harassment and does not sufficiently reflect the egregiousness and intrusiveness of his conduct and remarks.  Rather, her testimony was that Mr. Connison touched her "all the time" when they were working together, and the touching sometimes was accompanied by his locking a door or blocking her exit.  Her testimony also stated that he kept up a running banter of sexually-charged remarks at work, and in phone calls and texts, often explicitly naming body parts and sex acts, and asking about her sex life.   Exhibit "A," attached, provides more specific examples of Ms. Whitford's testimony about his sexual harassment.

According to her testimony, her response to these actions and remarks was to rebuff them, and that she felt "scared," "embarrassed," "degraded," "like a piece of meat," "self-conscious," and "humiliated." She stated that the harassment affected her job because she dreaded going to work and was scared about what would happen next at work.  However, she also explained that she felt that she had to put up with Mr. Connison's harassment despite these feelings because he was her boss and she needed the job because she had two small children to support.  Previously in this Memorandum Opinion, the court set out in detail Ms. Whitford's testimony that she had notified managers Brown and Cannon about the sexual harassment.

The court re-affirms that Ms. Whitford presented legally sufficient evidence to support the jury's finding that Mr. Connison invaded her privacy, as well as its finding that Sub-Line is

responsible for that conduct. Alabama law supports this decision.

In *Busby v. Truswal Sys. Corp,* the Alabama Supreme Court stated that "[t]he United States Supreme Court has specifically recognized 'marriage' and 'sexual' concerns as fundamental rights, entitled to privacy protection."   551 So. 2d at 324.  The Alabama Supreme Court reversed the Circuit Court's grant of summary judgment on the invasion of privacy claim where the evidence of seventeen separately listed instances of lewd touching and comments reflected that the male supervisor intruded into the sex lives of female employees in an offensive manner: e.g., comparing employees' nipple sizes, speculating about their sex lives, and asking one plaintiff if she would hold his penis while he urinated, etc.  The Court also found that evidence of the employees' complaints to the boss of their supervisor, who allegedly did not do enough to alleviate the situation, provided a factual issue for the jury regarding notice to the company and a means of holding the company liable for the wrongful conduct.  *Id.*

In *Phillips v. Smalley Maintenance Servs.,* the Alabama Supreme Court found that evidence of sexual harassment by a company president against an employee supported a claim under Alabama law for invasion of privacy under the "intrusion upon seclusion" theory. Examples of the president's conduct include: the president's repeatedly locking his office door when he called the employee there for conversation; the president's inquiring about how often she and her husband had sex, and what "positions" they used; the president's asking whether she had ever engaged in oral sex and insisting that she have oral sex with him or lose her job; the president's covering the office window with paper to prevent anyone from seeing inside before the employee forced her way out of the office; and striking her across the buttocks with his hand when she was in the process of leaving.  This harassment, which occurred two or three times a

14

week for a period of three months, caused the employee to be nervous and unable to adequately

perform her work, and ended in the employee's termination. 435 So. 2d 705, 707 (Ala. 1983).

The court finds that the nature of sexual harassment evidence in *Busby* and *Phillips* is

closely analogous to the nature of the evidence in the instant case.  However, the cases that Sub-

Line cites as support for its argument that a few sexual propositions do not support an invasion of

privacy claim, involve less egregious and intrusive facts than those listed above.  For example,

*McIsaac v. WZEW-FM Corp.* involved several unwanted, rebuffed sexual advances by the male

president and principal owner of a corporation operating a radio station toward a female sales

person before her firing: a conversation in which he implied that he wanted to have an affair with

her coupled with a subsequent thwarted attempt to kiss her; two or three weeks later, a suggestive

look, a request to come close; and a request for dinner, all refused; a phone call suggesting an

out-of-town visit together, refused; and several "suggestive lurks or little innuendoes."  495 So.

2d 649, 650 (Ala. 1986).  The court notes that, unlike the instant case, these *McIsaac* facts

involve no physical touching against the plaintiff's will, although the thwarted kiss was an

attempt to do so, and that the remarks in *McIsaac* were suggestive but were not overt sexual

propositions, inquiries into her sex life, and explicit naming of sexual body parts and sex acts

like Mr. Connison's remarks.

In another Alabama case on which Sub-Line relies, *Ex parte Atmore Cmty. Hosp.,* 719

So. 2d 1190, 1194-5 (1998), the Supreme Court of Alabama found that the co-employee's initial

conduct toward the plaintiff—looking up her skirt, making lewd comments, and asking her to

meet him outside of work hours for non-business purposes—"constituted substantial evidence

that he committed an invasion of privacy."   However, because evidence existed that the co-

employee's sexually harassing conduct ceased after the plaintiff reported the conduct to a supervisor, who ordered him to stop, and that his *subsequent* actions did not constitute invasion of privacy, the Court found no basis for holding the hospital liable on this claim. *Id.* The Supreme Court's *Ex parte Atmore* opinion fails to support an argument that Mr. Connison's actions do not constitute the tort of invasion of privacy. Indeed, Ms. Whitford's testimony reflected that Mr. Connison's actions were more of an egregious intrusion into private matters than the initial conduct of the co-employee at the hospital. In addition, the individuals harassing the plaintiff in *Ex parte Atmore* were co-employees, whereas Mr. Connison was a supervisor.

Sub-Line also cites as support two federal district court decisions that are not binding on this court and do not involve closely analogous facts: *Portera v. Winn Dixie of Montgomery, Inc.,* 996 F. Supp. 1418 (M.D. Ala. 1998) and *Beasley v. Wal-Mart Stores East, LP,* 2006 WL 3333069 (S.D. Ala. Nov. 16, 2006). In *Portera,* the district court found that the harassment "did not consist of continual intrusive inquiries into sexual interests or activities as did the conduct in *Phillips.*" 996 F. Supp. 1418, 1436 (M. D. Ala. 1998). That same distinction would apply to distinguish the conduct in *Portera* from Mr. Connison's harassment in the instant case. In *Beasley,* the invasion of privacy claim was based on three comments by the plaintiff's shift supervisor: offering to teach her how to play strip poker; commenting about her liking nuts, which she interpreted to be "men's nuts"; and asking her if she had a boyfriend, which she interpreted to be a prefatory question to asking her out on a date. The district court granted the employer's motion for summary judgment on the invasion of privacy claim, finding that a reasonable jury could not find that these three comments invaded her privacy. 2006 WL 3333069, at *1 & *5-6. The nature and quantity of the incidents of sexual harassment in the

16

instant case, containing continual, intrusive inquiries into Ms. Whitford's sexual life and frequent touching in a sexual way, are not analogous to those in *Portera* and *Beasley.*

For all of these reasons, the court confirms its finding that the evidence in the instant case was legally sufficient to support the jury's finding that Mr. Connison committed the tort of invasion of privacy.  The court will address subsequently whether the evidence is sufficient to hold Sub-Line liable for this tort.

### 2.  The tort of assault & battery

To successfully establish the tort of *battery* under Alabama law against Sub-Line, Ms. Whitford must have provided legally sufficient evidence to reasonably satisfy the jury as follows: that Mr. Connison intentionally touched Ms. Whitford or her clothes; that this touching was in a rude, angry or hostile manner; and that Sub-Line was liable for the acts of Mr. Connison.  To succeed on the claim of *assault*, the evidence required is similar, but instead of an actual touching, the evidence must show an intentional offer to touch, in the same manner, under circumstances as to create in Ms. Whitford's mind a well-founded fear of imminent battery, coupled with the apparent present ability to carry out the attempt.  APJI 5 & 5.05; *see Wright v. Wright,* 654 So. 2d 542, 544 (Ala. 1995).

Sub-Line argues that the evidence was legally insufficient to support assault and battery, because Mr. Connison performed the acts in the midst of flirtation, and that no evidence reflects that he was angry.  This argument mischaracterizes the requirements of assault and battery: "angry" is only one of the adjectives used to describe the manner of the touching or offer to touch.  The other adjectives describing the required manner of touching—hostile and rude—can describe actions that are unwelcome and sexually charged but are not committed in anger.  The

17

Alabama Supreme Court recognized that if the touching "was intentional, was conducted with sexual overtones, and was unwelcome . . . [t]hese factual assertions constituted substantial evidence that [the alleged tortfeasor] committed a battery." *Ex parte Atmore,* 719 So. 2d at 1194; *see also Portera,* 996 F. Supp. at 1437 (finding that the plaintiff's evidence that she was "surprised" when the co-employee touched her buttocks and "shocked" when he put his hand in her blouse meant that a question of fact existed of whether the touching constituted an assault and/or battery under Alabama law).

The cases that Sub-Line cites as support for its argument do not find otherwise. *See Wright v. Wright,* 654 So. 2d at 543-4 (affirming granting of summary judgment in favor of estranged husband, finding that his driving by the plaintiff's apartment, which is on his way to the grocery store, provided no evidence of assault or battery); *Surrency v. Harbison,* 489 So. 2d 1097, 1103 (Ala. 1985) (finding that conflicting evidence resulted in a question of fact for the jury regarding whether defendant intentionally operated mechanical rakes to cause them to hit the plaintiff on the back and the head); *Reed v. Wal-Mart Stores, Inc.,* 2000 WL 727113, *1 (M.D. Ala. May 3, 2000) (S.D. Ala. 2000) (stating that the plaintiff "was never touched by . . . any Wal-Mart employee in a hostile, angry, or rude manner" where he "was lawfully detained in a reasonable manner for a reasonable length of time to investigate what Wal-Mart employees reasonably believed was a case of shoplifting.").

The court confirms its finding that the evidence in the instant case was legally sufficient to support the jury's finding that Mr. Connison committed the tort of assault and battery.  Next, he court will address whether the evidence is sufficient to hold Sub-Line liable for this tort.

E.. Sub-Line's liability for Mr. Connison's wrongful acts

Sub-Line argues that the evidence does not provide a basis for holding Sub-Line liable for Mr. Connison's intentional torts of invasion of privacy and assault and battery.  Ms. Whitford responds that Sub-Line's ratification of his legally wrongful conduct forms a basis for company liability.

Sub-Line's argument that Sub-Line did not ratify Mr. Connison's conduct ignores Ms. Whitford's testimony.  Ms. Whitford testifed that, during her second week of employment, which would have been in September of 2014, Sub-Line manager Heather Brown acknowledged to store employees that she was aware of Mr. Connison's conduct: "she had a meeting with me and a couple other team members and said she knows how James is and if anybody feels like he does or says anything out of the way to let her know and she'll handle it."  Although Ms. Whitford reported Mr. Connison's sexual harassment to Ms. Brown in detail immediately after the meeting, Ms. Whitford knew of nothing that Ms. Brown subsequently did to address the harassment, and Mr. Connison's harassment of her continued as before.  Further, Ms. Whitford testified that she again reported Mr. Connison's sexual harassment to managers Heather Brown and Heather Cannon on October 15, 2017.  According to Ms. Whitford's testimony, the managers' response was that Heather Brown met with her and Mr. Connison the next morning, and Sub-Line fired Ms. Whitford.  The evidence does not reflect that Sub-Line conducted any investigation of Ms. Whitford's complaint, other than telling Mr. Connison about it, priot to the date she was fired on October 16, 2014.

This evidence is  legally sufficient to support a finding that Sub-Line knew of Mr. Connison's wrongful conduct, knew or should have known that such conduct was a legally wrongful act under Alabama law, and yet failed to take adequate steps to remedy the situation.

19

Therefore, the evidence is legally sufficient to support a finding that Sub-Line ratified Mr. Connison's wrongful acts through implicit approval.  *See Potts v. BE & K Const. Co.,* 604 So. 2d 398, 400 (Ala. 1992).

The court WILL DENY the renewed motion for judgment as a matter of law as to the invasion of privacy claim and the assault and battery claim.

F.  Negligent Training, Retention and/or Supervision of Mr. Connison

To recover on a claim of negligent training, retention and/or supervision, Ms. Whitford must first reasonably satisfy the jury by the evidence that Mr. Connison sexually harassed her and/or retaliated again her.  Ms. Whitford has satisfied this initial step, and the court has confirmed a sufficient basis for the jury's findings.  Next, she must also reasonably satisfy the jury from the evidence that Sub-Line breached a duty regarding Mr. Connison's training, retention, and/or supervision that proximately caused Ms. Whitford's injury.  *See Keel v. Banach,* 624 So. 2d 1022, 1026 (Ala. 1993) (setting out those elements).  To establish a duty, the evidence must reflect that Sub-Line had "notice or knowledge, either actual or presumed, of [Mr. Connison's] unfitness." *See Gardner v. State Farm Mutual Auto. Ins. Co.,* 842 So. 2d 1, 9-10 (Ala. Civ. App. 2002) (citing *Armstrong Bus. Servs. v. AmSouth Bank,* 817 So. 2d 665 (Ala. 2001)).

Sub-Line argues that Ms. Whitford did not and could not make such a showing because Ms. Whitford did not complain of sexual harassment until after Heather Brown told her that she would fire her; because both Mr. Connison and Ms. Whitford were aware of Sub-Line's rules against harassing conduct in the workplace; and because Defendant conducted an investigation after Ms. Whitford's complaint on October 16, 2014.

This argument is unavailing because it ignores key testimony of Ms. Whitford that she complained to management of Mr. Connison's sexual harassment in September of 2014, weeks before Heather Brown told her that she would fire her; that the sexual harassment continued unabated through her last work day of October 12, 2014; and that she complained again to management on October 15 and 16, 2014.  No evidence existed that Sub-Line did anything to investigate or protect her for weeks. Indeed, no evidence existed that Sub-Line investigated her report of harassment prior to the date she was fired on October 16, 2014: too little, too late.

Sub-Line points only to the investigation that occurred after her October 16, 2014 complaint and asserts that this after-the-fact investigation is sufficient because "the conduct did not reoccur." Mr. Connison's sexual harassment of Ms. Whitford did not reoccur after October 16, 2014 because Sub-Line fired Ms. Whitford.  Alabama law does not support the argument that an adequate response to complaints of sexual harassment is to ignore those complaints until the harassed employee leaves employment, then tardily begin the investigation.  *See, e.g., Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 985 (Ala. 1999) (reversing summary judgment in favor of the bank defendants on the claim of negligent or wanton failure to properly investigate, train, supervise and discipline despite the existence of a bank policy against sexual harassment, when, after plaintiff complained of her supervisor's resumed sexual harassment, management failed to conduct a follow-up investigation until after the employee left the job). If it did, employers would be encouraged to ignore sexual harassment complaints until the employee quits or is fired and then conduct a belated investigation simply to avoid liability.  Rather, Alabama law requires an "adequate" investigation, which includes a timeliness factor.  *Machen*, 761 So. 2d at 985.  Evidence of Sub-Line's tardy investigation does not render legally

insufficient the jury's finding that Sub-Line had notice or knowledge prior to October 16, 2014 of Mr. Connison's repeated sexual harassment violating company rules and "unfitness" to hold his position; Sub-Line was negligent in failing to take adequate steps to protect its employees from him.

To the extent that Sub-Line argues it fulfilled its duty to protect from sexual harassment with the mere promulgating or posting a company rule against sexual harassment, that argument flies in the face of Alabama law. *See, e.g., Machen*, 761 So. 2d at 985. Notifying the employees of the company's policy against sexual harassment was a good first step; however, once Sub-Line had notice that Mr. Connison was violating that policy, it could not rest on that policy with impunity and close its eyes to notice of the policy's violation. Rather, it was required to take "adequate steps to remedy the situation." *See Potts,* 604 So. 2d at 400-401. In the instant case, the jury found that Sub-Line did not fulfill that duty and that Ms. Whitford was injured as a result.

As the court found when it denied the original motion for judgment as a matter of law, the evidence is legally sufficient to support that finding; therefore the court WILL DENY the renewed motion for judgment as a matter of law as to the claim for negligent supervision, training, and retention.

In sum, the court WILL DENY the renewed motion for judgment as a matter of law as to all claims.

### B.  Motion for Remittitur

As an alternative to the motion for judgment as a matter of law, Sub-Line requests a remittitur of the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. A motion to

alter or amend under Fed. R. Civ. P. 59 does not provide a mechanism for a dissatisfied party to re-litigate a matter. *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) ("A Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment"). The Eleventh Circuit has recognized two grounds for granting a Rule 59 motion: "[1] newly-discovered evidence or [2] manifest errors of law or fact." *Id.* at 1343 (quoting *In re Kellogg,* 197 F.3d 1116, 1119 (11th Cir. 1999)). Courts in this district have recognized that an intervening change in controlling law is also a ground for reconsideration and an exception to the law of the case doctrine. *See, e.g., Summit Medical Center of Alabama, Inc. v. Riley,* 284 F. Supp. 2d 1350, 1355 (M. D. Ala. 2003) (addressing a Rule 59 motion); *Oliver v. Orange Cnty., Fla.,* 456 F. App'x 815, 818 (11th Cir. 2012) (listing the following exceptions to the law of the case doctrine, allowing a district judge to reconsider a prior ruling: "(1) new evidence; (2) an intervening change in the law that dictates a different result; or (3) that the prior decision was clearly erroneous and would result in manifest injustice.").

In its motion, Sub-Line asserts that the judgment exceeded the statutory caps under Title VII and that the evidence was legally insufficient to support the jury's award of $30,000 in compensatory damages for emotional pain and mental anguish, and $100,000 in punitive damages, because Sub-Line employs less than 50 employees. In support of that argument, it presents the declaration of Keith Comer, stating that, in 2014, the average number of employees among the three stores that Sub-Line owns and operates is 20 employees. *See* 42 U.S.C. § 1981a(b)(3).[4] One of Ms. Whitford's responsive arguments is that Sub-Line has waived the right

---

[4] This statute provides: "The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages

to assert the statutory cap based on its size and the number of employees.  Ms. Whitford first raised this issue in her motion in limine (doc. 40, at 5-6), stating that "it is Defendant's burden to prove that it is subject to one of Title VII's damage caps, and Defendant has failed to preserve the issue in the pretrial."  Applying the Supreme Court decision of *Concrete Pipe & Prod. of Cal, Inc. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 628-30 (1993) to the instant case, the concerns of due process and the traditional burden of proof require the defendant employer to bear the burden of persuasion and production on the caps issue, but it failed to preserve that issue; in the pretrial order, which superceded the pleadings, Sub-Line did not include this defense, but simply denied the matters upon which the Plaintiff had the burden.

In its Order on the motion in limine, this court granted the request that Sub-Line be prohibited from introducing evidence relating to its size for the purpose of invoking statutory caps for Title VII claims:  "The Defendant has acknowledged that it is not pursuing the defenses that were not stated in the Pretrial Order and does not intend to offer evidence supporting such defenses. . . . [T]he court ORDERS that the Defendant shall not present evidence relating to its size for the purpose of invoking caps that Congress imposed through the 1991 amendments to Title VII, as Defendant has not raised that defense [in the pretrial order] and it has agreed not to present arguments to the jury regarding it."  (Doc. 48, at 1-2).

Given Sub-Line's failure to timely raise that defense, the court's ruling, and Sub-Line's agreement, Sub-Line cannot now raise the issue on a motion for remittitur and rely on the statutory cap based on size. Rule 59 does not provide litigants a do-over when they missed their

---

awarded under this section, shall not exceed, for each complaining party–(1) in the case of a respondent who has more than 14 and fewer than 101 employees in each of the 20 or more calendar weeks in the current or preceding calendar year, $50,000. . . ."

opportunity to raise matters prior to trial or the jury verdict causes them to regret the positions

they took.  Not only has the court already ruled on this issue, but Sub-Line is judicially estopped

from invoking the statutory caps because of the inconsistent position that it has taken in the

pretrial order and at the final pretrial.  *See Burnes v. Pemco Aeroplex, Inc.,* 291 F.3d 1282, 1285-

86 (11th Cir. 2002).

In any event, this issue is not one appropriately addressed pursuant to Rule 59, because it

does not involve newly-discovered evidence; manifest errors of law or fact; or an intervening

change in controlling law.  For all of these reasons, the court WILL DENY the Rule 59(e) motion

to the extent that it request the application of statutory caps based on the size of the company and

the number of employees.

As an alternative ruling, the court FINDS to the extent, if any, that the statutory cap

based on size applies to and limits the punitive damage award for the federal claims, remittitur is

still not warranted.  The jury's verdict clearly reflects that it awarded compensatory and punitive

damages under federal *and state* law claims, and "[t]he federal cap does not limit damages under

parallel state laws . . . ."  *See Bradshaw v. Sch. Bd.,* 486 F.3d 1205, 1208 (11th Cir. 2007) (citing

42 U.S.C. §§ 2000e-7 and 2000h-4).

Sub-Line also argues that the court should reduce the Title VII punitive damages award,

because Sub-Line's actions do not warrant punitive damages, and, specifically "[t]he ratio of

punitive damages to actual harm allegedly inflicted is much too large to support the punitive

damage award."  This court does not agree.

As Ms. Whitford points out in her response, "the ratio of 3.1 to 1 ($100,000 punitive

damages to $31,956 in compensatory damages and lost wages) is well within the range [that the

Eleventh Circuit and Supreme Court of the United States have found acceptable.]" (Doc. 64, at 16 (citing *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1283 (11th Cir. 2008)).  The court FINDS legally sufficient evidence to support the punitive damages award based on evidence that Ms. Whitford complained to management about Mr. Connison's sexual harassment of her, including conduct supporting her state claims for invasion of privacy and assault and battery;  evidence of Sub-Line's conduct in failing to investigate her complaints and failing to take adequate corrective action to protect her; and evidence that Sub-Line terminated Ms. Whitford when she continued to complain about Mr. Connison's conduct.

The court WILL DENY Sub-Line's alternative request for a remittitur.

### C.  Motion for a New Trial

Sub-Line's motion for new trial, another motion in the alternative, is brought pursuant to Rule 59(a)(1)[5]  of the Federal Rules of Civil Procedure, which provides: "The court may, on motion, grant a new trial on all or some of the issues—and to any party as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." *See* Fed. R. Civ. P. 49(a)(1)(A) (2009). Sub-Line's motion is based on an evidentiary ruling, asserting that the introduction of Mr. Connison's Facebook posts improperly prejudiced the jury against him.  Sub-Line does not point this court to any controlling federal court ruling granting a new trial based upon a district court's analogous discretionary ruling on an evidentiary matter.  However, in *Coquina Inv. v. TD Bank, N.A.*, the Eleventh Circuit addressed

---

[5] Although the motion itself states that it is brought pursuant to Rule 59(b), that rule merely provides the deadline to file the motion, not the grounds for filing.

asserted evidentiary errors and explained that, "[i]n order to justify granting a new trial, an error must have affected 'substantial rights' or caused 'substantial prejudice'; otherwise, the error is harmless."  760 F.3d 1300, 1309 (11th Cir. 2014) (citing *Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1162 (11th Cir. 2004)).

Sub-Lines states generally that the court should have excluded the Facebook posts as irrelevant under Rules 401, 404(b)(1) and 403 of the Federal Rules of Evidence, and that the posts "enflamed the jury's passion." This general statement of prejudice–without further explanation, a general assertion of irrelevancy–without specifying why the posts are irrelevant, and the general invocation of three evidentiary rules–without addressing how the introduction of the Facebook posts violates them, is unhelpful.  Sub-Line raises the issue but fails to explain, perhaps expecting the court to develop the argument on Sub-Line's behalf; however, the court's role is not to function as an advocate for either side and is certainly not to develop arguments against its own rulings.

The court CONFIRMS its discretionary rulings pursuant to Rules 401, 403, and 404.  The court FINDS that no error existed, and, even assuming *arguendo* that this evidentiary ruling was error, the alleged error affected no substantial rights and did not cause substantial prejudice. Therefore, the court WILL DENY the alternative motion for new trial.

Dated this 21st day of July, 2017.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

**EXHIBIT "A"**

The following are examples of Ms. Whitford's testimony at trial about Mr. Connison's sexual harassment:.

<u>Touching and other Physical Actions:</u>

• Ms. Whitford was speaking to a female co-worker about body changes after pregnancy, including a decrease in size of her breasts, when Mr. Connison came from the other side of a wall, grabbed her breast and said, "I'll check for you."

• "It didn't matter how far apart I was from the counter or from whatever obstruction we were beside, he would make a point to bump into me, whether it be by my chest to make sure he touched my breasts, or there was a time he was walking by me and stopped, said something and rammed his penis in my butt . . . ."

• "He grabbed my butt on several occasions, multiple occasions, in front of customers, outside the store, inside the store."

• "He stuck his hand into the inside of my pants holding onto my belt and pulled me towards him and told me that I should give him a try."

• When she was alone in the store with Mr. Connison, "[t]he touching would get worse versus him just walking by and, grazing my butt or whatever, he would be ramming me with his front side.  He would be smacking me on my ass. It was grabbing my boobs from behind."

• On October 12, 2014, Ms. Whitford was in the cooler and Mr. Connison blocked the doorway, moved close to her so that they were standing nose-to-nose, and said, "you're not getting out until I get what I want."  Ms. Whitford panicked, forced her way out of the cooler, and got away from him when he tried to grab her.  Mr. Connison walked out the back of the store, slammed the door in an angry manner, and then came back in the store, told her he was leaving, and left the store before the end of his shift without uttering another word.

<u>Sexual Comments:</u>

• When Ms. Whitford asked a customer which size of sub sandwich he wanted—a six-inch or a twelve inch, Mr. Connison said to Ms. Whitford: "I have more than twelve inches for you."

• When Ms. Whitford was discussing Subway sauce with customers present, Mr. Connison "said that he heard that his was spicy, asked me if I wanted to try it."

• When Ms. Whitford "bending over to put something in the cooler and didn't realize he was, of course, behind me and said if I bend over a little bit further, he could see my lips from behind."

• Mr. Connison said, "referencing my body, saying I'd tap that."

• "[I]n front of customers, he had made the motion with sticking his tongue to his cheek . . . kind of like a blow job, guess, and said 'I bet you can suck a dick.'"

• Mr. Connison referred to parts of women's bodies at work all the time, using vulgar terms such as "tits or chachas pussy."

28

- When Ms. Whitford gave Mr. Connison a ride home at his request during work hours, he invited her inside, and, when she declined, "he informed me to come in, I could get paid for being on top."
- Mr. Connison propositioned Ms. Whitford one day the two of them were alone in the store during work hours, and he locked the front door and asked her to go in back with him where the cameras could not see what they were doing.
- Mr Connison said "that he had only been in relationship with one other person at Subway, but he would make an exception with me. . . ."
- Mr. Connison telephoned Ms. Whitford when she was working one night with Kendra Dean, and said "do you want me to come back, we could have a threesome."  When she said no, he asked, "What about a twosome?"
- Mr. Connison telephoned her another time at work when she was shutting the store down, and "he told me that he was in the bath–he was taking a bath and he was thinking about me and he was getting rock hard."
- When Ms. Whitford and a female co-worker thought they were alone, they were discussing about the birth of Ms. Whitford's daughter and needing vaginal stitches, and "James came around the corner and said, 'I bet that pussy's tight.'"
- Mr Connison asked whether she and her ex-husband "were fucking."
- Mr. Connison "said that all his other girlfriends always come back for more or something like that and I should give him a try."